Receipt number AUSFCC-10422568

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JEFFREY and ANNA HECK,<br><br>OSVALDO and REYNA CASTILLO,<br><br>MARY COURNOYER,<br><br>N. KELLY and CORNELIA GRAY,<br><br>JAMES GULSBY, JR.,<br><br>LESLIE and LARISA KRAJCOVIC,<br><br>VITALIY and OLGA OSIPOV,<br><br>MARLAND PHILLIPS,<br><br>CECILY ANN READING,<br><br>ROSEMARY PROPERTIES, LLC,<br><br>DANIEL and NICOLE STAROSTECKI,<br><br>RICHARD and JACQUELINE STUART,<br><br>MARK THEILER,<br><br>PHONG THANH TRAN and<br>   GIANG THU VO HO, and<br><br>JEFFREY and ANN WALL,<br><br>      Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>      Defendant. | CASE NO. <u>25-802</u> L |

## COMPLAINT

## SUMMARY OF THIS LAWSUIT[1]

*The federal government violated the United States Constitution and took private property from Sarasota, Florida, landowners without paying the landowners. When the government takes private property, the government has an absolute and "categorical" obligation to pay the owner. This landowner asks this Court to order the federal government to pay "just compensation" for that private property the federal government took.*

*The federal government took private property for the northern extension of the Legacy Trail between Sarasota and Venice. The Legacy Trail is a public recreational trail and future railroad corridor the federal government created under the National Trails System Act.[2]*

*In the early 1900s, Adrian Honoré and his sister, Bertha Palmer, and Bertha's sons, Honoré and Potter Palmer II, and other families granted the Seaboard Air Line Railway a right-of-way easement allowing the railroad to use a strip of their land to build and operate a railway line between Sarasota and Venice. When the land was no longer used for the operation of a railroad, the right-of-way easement terminated, and the present-day owners (the successors-in-title to the Honoré and Palmer family) held unencumbered title to their land and had the exclusive right to possess and use their land and to exclude others from using their land.[3]*

*CSX Transportation (CSXT) and Seminole Gulf Railway (Seminole Gulf) were the successor-railroads to Seaboard. By 2002, CSXT and Seminole Gulf no longer operated a railway line over this strip of land. The railroads petitioned the federal Surface Transportation Board (the Board) for authority to abandon the*

---

[1] This summary is not part of the complaint but is provided for the convenience of the Court and parties.

[2] The National Trails System Act of 1968 (as amended in 1983), codified at 16 U.S.C. §1241, *et seq*.

[3] We use the term "reversionary" as a shorthand description of the owner of the fee estate's interest. This is not technically correct, since nothing "reverts," but it is frequently used to describe how landowners regain their full possessory interest in land once burdened by an easement. The owner of the fee estate continually possesses the fee estate. "There is an alternative way…to describe property transactions involving easements. Instead of calling the property owner's retained interest a fee simple burdened by the easement, this alternative labels the property owner's retained interest following the creation of an easement as a 'reversion' in fee. Upon the termination, however achieved, of the easement, the 'reversion' is said to become fully possessory; it is sometimes loosely said that the estate 'reverts' to the owner." *Preseault v. United States,* 100 F.3d 1525, 1533 (Fed. Cir. 1996) (*en banc*) (*Preseault II*). See also *Marvin M. Brandt Rev. Trust v. United States*, 572 U.S. 93, 106, n.4 (2014), and *Monroe County Comm'n v. Nettles,* 288 So.3d 452 (Ala. 2019).

*railway line between Venice and Sarasota. The federal government granted permission to abandon this railway line.*

*Under Florida law and according to the explicit terms of the conveyance Adrian Honoré granted the railroad in 1910, the easement terminated, and the present-day landowners held unencumbered title to the land and enjoyed the exclusive right to use and possess their land.[4] Correspondingly, because the easement terminated, CSXT and Seminole Gulf had no right or interest they could sell or transfer.*

*But the federal government wanted land under otherwise-abandoned railroad rights-of-way (such as this segment of the Venice-to-Sarasota railway line) to be used for public recreation and a possible future public transportation corridor across the land. To achieve this objective Congress amended the National Trails System Act adding section 8(d).[5] Congress's Trails Act scheme granted the Board authority to take private property and encumber an owner's land with an easement for public recreation and a possible future railway line.*

*In April 2004 the Board issued an order invoking the Trails Act and established a federal rail-trail corridor easement across private land between Venice and Hugh Culverhouse Park. The land taken for this Southern Segment of the Legacy Trail was the subject of earlier lawsuits. See* Rogers v. United States, *90 Fed. Cl. 418 (2009).[6] This Court ordered the government to pay the owners whose land was taken for the Southern Segment of the Legacy Trail.*

*About fifteen years later, in December 2017, the Board issued another order extending the Legacy Trail more than a mile-and-a-half north from Hugh Culverhouse Park to Ashton Road (the Middle Segment). The amount of*

---

[4] Chief Justice Roberts explained that when a railroad no longer uses its right-of-way, the owner of the fee estate regains unencumbered title and possession of their land:

> The essential features of easements – including, most important here, what happens when they cease to be used – are well settled as a matter of property law. An easement is a "nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement." "Unlike most possessory estates, easements...may be unilaterally terminated by abandonment, leaving the servient owner with a possessory estate unencumbered by the servitude." In other words, if the beneficiary of the easement abandons it, the easement disappears, and the landowner resumes his full and unencumbered interest in the land.

> *Brandt Trust*, 572 U.S. at 104-05
> (quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES §1.2).

[5] Codified at 16 U.S.C. §1247(d).

[6] See also *McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608 (2013), and *Childers v. United States*, 116 Fed. Cl. 486 (2014).

*compensation the federal government owes the owners of the land taken for this Middle Segment of the Legacy Trail is being determined in* <u>Cheshire Hunt v. United States</u>*, No. 18-111 (Meyers, J.).*

*A little more than a year later, the Board then issued another order, in May 2019, taking more private property to extend the Legacy Trail further north from Ashton Road to Fruitville Road (the Northern Segment).  Over two hundred owners of the land taken for this extension of the Legacy Trail sued seeking compensation for that property taken for this Northern Segment.  That case is* <u>4023 Sawyer Road, LLC v. United States</u>*, No. 19-757 (Meyers, J.).*

*When the government takes private property, the government must pay the owner.  An owner's right to his or her private property is a fundamental civil right guaranteed by the Takings Clause of the Fifth Amendment to the United States Constitution.[7]  The Supreme Court and lower federal courts have explained that the federal government's invocation of the Trails Act takes an owner's private property, and the federal government must pay the owner.[8]  The federal government must make the owner whole.  This means the federal government must also reimburse the owner's legal fees and litigation expenses and pay the owner compensation for the government's delay in paying the owner compensation.  See* <u>Seaboard Air Line Ry. Co. v. United States</u>*, 261 U.S. 299, 304 (1923) ("The compensation to which the owner is entitled is the full and perfect equivalent of the property taken.  It rests on equitable principles and it means substantially that the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken.  He is entitled to the damages inflicted by the*

---

[7] The Fifth Amendment provides, "No person shall be…deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."  Consider also Supreme Court Justice Holmes's decision in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 416 (1922) ("We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."), and the Supreme Court's decision in *Armstrong v. United States,* 364 U.S. 40, 49 (1960) ("The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.").  See also *Knick v. Township of Scott*, 139 S.Ct. 2162, 2177 (2019) ("government violates the Takings Clause when it takes property without compensation").

[8] *Preseault v. Interstate Commerce Comm'n,* 494 U.S. 1 (1990) (*Preseault I*); *Preseault v. United States*, 100 F.3d 1525, 1533 (Fed. Cir. 1996) (*Preseault II*) (*en banc*); *Toews v. United States*, 376 F.3d 1371 (Fed. Cir. 2004); *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004); *Barclay v. United States*, 443 F.3d 1368 (2006); *Illig v. United States,* 274 Fed. App'x 883 (2008), *cert. denied*, 557 U.S. 935 (2009); *Ladd v. United States*, 630 F.3d 1015, 1020 (Fed. Cir. 2010) (*Ladd I*), *reh'g denied* 646 F.3d 910 (Fed. Cir. 2011); *Ladd v. United States*, 713 F.3d 648, 652 (Fed. Cir. 2013) (*Ladd II*); *Navajo Nation v. United States*, 631 F.3d 1268, 1275 (Fed. Cir. 2011).

*taking.").*[9]  *Even though this Court has already held that the federal government took private property for the Legacy Trail, and even though the Department of Justice has agreed the federal government took owners' private property for the Legacy Trail, the federal government has still not paid these landowners.*

*This landowner asks this Court to order the federal government to pay for that property the federal government took plus interest for the government's delay in paying and reimburse all legal fees and litigation expenses as the government is required to do under the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. §4654(c).*

## JURISDICTION AND VENUE

1.      The Tucker Act, 28 U.S.C. §1491(a), provides, "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded upon the Constitution."  This owner's claim is founded upon the Fifth Amendment of the United States Constitution.

2.      The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654(c), provides that the federal government must pay the legal fees and litigation expenses, including expert and appraisal fees, this owner incurs in this lawsuit vindicating his right to be paid for that property the federal government took from him.

## THE CONSTITUTIONAL AND STATUTORY PROVISIONS GOVERNING THIS LAWSUIT

3.      The following provisions of the United States Constitution and the United States Code define the federal government's obligation to this Florida owner.

(a)      The Fifth Amendment to the United States Constitution provides, "No person shall…be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

---

[9] Citations omitted; citing, *inter alia*, *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 327 (1893).

5

(b)    Section 8(d) of the Trails Act, codified as 16 U.S.C. §1247(d), provides, "interim use [of abandoned railroad right-of-way easements for public recreation] shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."

(c)    The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654(c) (URA) (Pub. L. 91-646; 84 Stat. 1894), requires the federal government to pay these owners "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of this proceeding."

(d)    Section 4622(a) of the URA provides the federal government must, among other things, also pay the expenses and costs an owner incurs when the government takes private property including all the: "(1) actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property; (2) actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation … (3) actual reasonable expenses in searching for a replacement business or farm."

## STATEMENT OF FACTS

**A.    The Seaboard Air Line Railway did not own the land across which the railroad built its railway but only had a right-of-way easement to operate a railway line across a strip of land this plaintiff owned.**

4.    A railroad right-of-way is like a turtle on a fence post.  It doesn't get there by itself. The land now owned by the plaintiffs bringing this lawsuit was owned in 1910 by Adrian Honoré and other owners including Sarasota Land Company, Florida Mortgage & Investment Company, Moses Neihardt, O.H. Pendley, and A.C. Clough.

5.    In the early Twentieth Century almost one-third of the land in what is now Sarasota County, Florida, was owned by Bertha Palmer and members of her family, including her brother

Adrian C. Honoré, her sons, Honoré Palmer and Potter Palmer, II, and corporate entities owned by the Palmer family, including the Sarasota-Venice Company and the Palmer Florida Company. Collectively the Palmer family owned more than 140,000 acres of land on Florida's Southwest Gulf Coast, including most of the land between Sarasota and Venice.[10]  The other land between Sarasota and Venice was owned by Sarasota Land Company, Florida Mortgage & Investment Company, Moses Neihardt, A.C. Clough, and O.H. Pendley.

6.      These owners wanted Sarasota to prosper and supported the development of Sarasota with infrastructure, including drainage canals and railroads.  These owners' support of Sarasota County infrastructure included granting the Seaboard Air Line Railway a right-of-way easement to build an almost-twenty-mile-long railway line from Sarasota south to Venice.

### a.      Tampa Southern Railroad Company condemned a "right-of-way" across the Tankersley and Davis land.  (Exhibit 1)

7.      John C. Bishop (J.C. Bishop) was one of the founders of Sarasota and owned very large tracts of land in what is now Sarasota County, Florida.  J.C. Bishop had two daughters, Bonnie Bishop born in 1884, and Mattie Bishop born March 25, 1892.  On March 14, 1924, J.C. Bishop, then a widower, gave a life estate in a tract of his Sarasota land to his eldest daughter Bonnie and gave his younger daughter, Mattie, a contingent life estate should Bonnie die without "children."

8.      On April 9, 1925, the railroad's real estate agent prepared a metes and bounds legal description of an 8.98-acre strip across the land owned by Bonnie Tankersley and Mattie Davis.

---

[10] What is now Sarasota County, Florida, was once part of Mantee County.  Sarasota County was established in 1921.

This metes and bounds survey described the property as "FOR CONDEMNATION OF RIGHT OF WAY FOR TAMPA SOUTHERN RAILROAD THRU LANDS OF J.C. BISHOP."[11]

9.    Bonnie Tankersley and Mattie Davis did not want a railway line across their land. So, Tampa Southern Railroad filed a condemnation lawsuit in federal district court on September 14, 1925, for the purpose of acquiring a "right-of-way" across an 8.98-acre strip of land then owned by "Bonnie K. Tankersley and Mattie Davies." Tampa Southern Railroad told the district court that this strip of land was "for the purpose of its use as *a right-of-way* for the construction of its railroad." (emphasis added.) [12]

10.    In its sworn petition Tampa Southern Railroad stated "it has duly located its line of railroad and intends in good faith to construct *the same over and through* the property hereinafter described. That it desires to condemn [the strip of land] *for use as a right of way the* [described strip of land]." Tampa Southern Railroad further affirmed that, "Petitioner further shows unto the Court that the taking of the said property by your petitioner *is for the purpose of its use as a right of way for the construction of its railroad, and that the said property is necessary for that purpose*." (emphasis added).

11.    Federal district Judge Lake Jones ordered Tankersley and Davis to "show cause why said property should not be taken *for the uses and purposes set forth in the petition filed* by Tampa Southern Railroad Company…and more particularly, why the said lands should not be

---

[11] (capitalization in original).

[12] The pleadings and documents from the federal district court and Sarasota County archives are in chronological order with a separate tab for each document. The condemnation pleadings refer to Mattie V. *"Davies"* when, in fact, her last name was *"Davis"* not *"Davies."* We refer to Mattie Davis by her proper name "Davis" but, when quoting from the condemnation pleadings, we quote the document as written with "Davies" as Mattie's surname.

taken *for use as a right-of-way* by the Tampa Southern Railroad Company...."  Tampa Southern Railroad Company's charter, which allowed Tampa Southern to extend its existing railway line from Tampa to Sarasota, did not authorize the railroad to condemn property south of downtown Sarasota.

12.    Tankersley and Davis argued that, because the Tampa Southern Railroad Company is a "corporation duly incorporated under the laws of the State of Florida as a public carrier for the operation of a commercial railroad and is authorized to construct, maintain and operate a railroad," the railroad is not authorized to condemn property for the "construction or for its right-of-way...beyon[d] its terminus in the City of Sarasota."  Tankersley and Davis argued that a right-of-way across their land (which was south of the railroad terminal in Sarasota) was "not essential for the construction of its line of railroad from the City of Tampa to the City of Sarasota but [is] beyond the destiny and termination of its purposes and authority and its power to extend and *proceed with its said road and with condemnation for its construction or for its right-of-way*."  (emphasis added.)

13.    Judge Jones denied Tankersley's and Davis's motion and granted Tampa Southern Railroad authority to condemn a "right-of-way" "through and across" Tankersley's and Davis's land "for use as a right of way for said Railroad Company."  The district court's verdict provided, "It is considered by the Court that the property therein described be appropriated by the Tampa Southern Railroad Company for *use as a right of way* for said Railroad Company...."  (emphasis added).  The Court ordered Tampa Southern to pay Tankersley and Davis compensation and the jury determined Tampa Southern must pay Tankersley and Davis $61,500 and pay $5,000 in attorney fees.  The federal district court issued the condemnation decree on March 18, 1926.

*b.*      **The Sarasota Land Company conveyance. (Exhibits 2-A and 2-B)**

14.      In July 1910 the Delaware corporation Sarasota Land Company's president, George Brown, and the company's secretary W.W. Stevenson signed a deed that, for five dollars, granted Seaboard a right to "a strip of land one hundred (100) feet wide, being fifty (50) feet on each side of the center of the Seaboard Air Line Railway *as located across lands owned by the [Sarasota Land Company]*." (emphasis added.) The document from Sarasota Land Company to Seaboard describes the railway line as *already located across* Sarasota Land Company's property.  The land is described as a "strip of land one hundred (100) feet wide, being fifty (50) feet on each side of the center line of the Seaboard Air Line Railway as located across the lands owned by" the grantor.

*c.*      **The Clough conveyance.  (Exhibits 3-A and 3-B)**

15.      In July 1910 A.C. and Flora Clough of Washington, D.C. signed a document memorializing an interest in "a strip of land one hundred (100) feet wide, being fifty (50) feet on each side of the center line of the Seaboard Air Line Railway *as located across lands owned by the [Cloughs]*." (emphasis added.) The land subject to this conveyance was 1.9 acres and the consideration paid the Cloughs was $50.00.

*d.*      **The Neihardt conveyance.  (Exhibits 4-A and 4-B)**

16.      In 1905 Moses Neihardt, a Missouri widower, signed a document reciting only one dollar of consideration, and describing a fifty-foot-by-sixty-foot strip of land.  The Neihardt deed is a generic form deed without any description of the interest conveyed.

*e.*      **The Florida Mortgage & Investment Company.  (Exhibits 5-A and 5-B)**

17.      The Florida Mortgage & Investment Company (Florida Mortgage) executed two documents in 1905.  The relevant language is identical.  The deeds conveyed a "RIGHT-OF-WAY" to the railroad.  The blueprints attached to the deeds further describe the conveyance as a "RIGHT

10

OF WAY." (capitalization in original.)  The deed from Florida Mortgage states: "Description of part of the *right-of-way* to be obtained from Col. J. H. Gillespie."

### f.    The O.H. Pendley land.  (Exhibits 6-A and 6-B)

18.    The land owned by Oscar Pendley and his wife is not the subject of any validly executed recorded conveyance to the railroad.

19.    The railroad built a railway across the Pendley land without any grant from the Pendleys.  Thus, the railroad's interest in this strip of land is only at most a prescriptive easement for a railway right-of-way that terminated when the railway line was abandoned.

20.    The interest the railroad was granted was a right-of-way easement, which is a servitude across land owned by another.  See THOMPSON ON REAL PROPERTY (2nd ed.) §60.02(c) ("The right in land held by an easement holder differs from the fee interest or even the leasehold interest in that it is a 'use' interest, but not a 'possessory' interest in the land.  Thus the easement holder has neither the permanent possession of even a single molecule of the land itself...the easement holder has the right to make or control a particular use of the land that remains owned by another.").  See also Jon Bruce & James W. Ely, Jr., THE LAW OF EASEMENTS & LICENSES IN LAND §1.1 ("An easement is commonly defined as a nonpossessory interest in the land of another. … [T]he nonpossessory feature of an easement differentiates it from an estate in land. … [T]he holder of an affirmative easement may only use the land burdened by the easement; the holder may not occupy and possess the realty as does an estate owner.").  The important point is that an easement is a "servitude" imposed upon land owned by another.  An easement or servitude allowing the easement-holder to use the land is not ownership of the land itself.  Furthermore, the rights of the easement-holder to use land owned by another are strictly defined by state law and the terms of the grant of the easement.  Again, an easement-holder does not *own* the land.

**B.    The Seaboard's successor-railroads abandoned the railway line between Sarasota and Venice.**

21.    Seaboard went bankrupt.  Seaboard's assets (including its interest in the Sarasota-to-Venice right-of-way easement) wound up in the hands of successor railroads.  The Sarasota-to-Venice right-of-way was ultimately transferred to CSX Transportation, Inc. (CSXT), which leased the railway line to Seminole Gulf Railway, L.P. (Seminole Gulf).  See *Seminole Gulf Railway Exempt Abandonment, Environmental/Historic Report*, STB Docket No. AB 400 (Sub. No. 7X), p. 9.

22.    By the 1980s Southwest Florida's Gulf Coast had changed.  The land was no longer used for phosphate mining, timber, turpentine, and cattle farms.  The Tamiami Trail (so called because it ran between Tampa and Miami) opened as a highway in 1928, and Interstate Highway 75 was completed in 1969.  The Tamiami Trail (U.S. Highway 41) and I-75 parallel the former railway line between Sarasota and Venice.  Sarasota also had an international airport, and tourists no longer traveled to Sarasota by train.  CSXT and Seminole Gulf no longer needed or wanted a railway line between Sarasota and Venice.  The railway line was not profitable.  Trains hadn't run across the right-of-way in decades, and no shippers needed rail transportation on this Sarasota-to-Venice corridor.  The last train to run across the right-of-way was more than a decade ago when the Seminole Gulf Railway brought a boxcar of plywood from Sarasota to a lumberyard in Venice.  The railway line was dilapidated and not maintained.  Seminole Gulf and CSXT removed the tracks and ties from the land.  Seaboard Railway's successor-railroads abandoned the Sarasota to Venice railway line in three segments, each of which was the subject of a separate petition filed with the Board.

23    In April 2004, CSXT and Seminole Gulf petitioned the Board for permission to abandon a 12.43-mile-long segment of the railway line between Venice and Hugh Culverhouse

Park south of Sawyer Loop Road.[13]  The Board granted the railroad's request to abandon the rail line. Sarasota County aided by the Trust for Public Land a not-for-profit conservation organization asked the Board to invoke section 8(d) of the Trails Act and establish a new federal easement for public recreation and a future railway line.  Sarasota County was the designated "trail-sponsor." The Board granted Sarasota County authority to use the strip of land for a public recreational trail. The Board also retained jurisdiction over the strip of land with authority to authorize a rail carrier to build a railway line across the land in the future.

24.     In December 2017, Seminole Gulf and CSXT requested the Board to authorize the abandonment of a 1.7-mile-long segment of the Sarasota-to-Venice railway line between Hugh Culverhouse Park near Sawyer Loop Road and Ashton Road (the Middle Segment).  The Board granted the railroads' request to abandon this segment of the rail line.  Sarasota County wanted to use this land for an extension of the Legacy Trail.  The Board issued a second order invoking section 8(d) of the Trails Act and encumbered the land under this segment of the abandoned railway line with a federal rail-trail corridor easement for public recreation and a future railroad. Sarasota County was the designated trail-sponsor and has since built a public recreational trail across the land.

25.     Finally, in May 2019, Seminole Gulf and CSXT requested the Board to authorize them to abandon a 7.68-mile-long segment of the former Sarasota-to-Venice rail line.  This strip of land lies between Ashton Road and Fruitville Road.  The Board granted the railroads' request to abandon this railway line.[14]  See **Exhibit 7** (*Notice Exempt Abandonment*, STB Docket No. AB-

---

[13] Hugh Culverhouse Park is an eighty-two-acre tract of land Hugh and Eliza Culverhouse donated to Sarasota County in 2006.  See *Palmer Ranch Holdings Ltd. v. Commissioner of Internal Revenue*, 812 F.3d 982, 985 (11th Cir. 2016).

[14] This Northern Segment was described in the Board's filing as the Venice Branch Line between milepost SW 890.29 on the north side of Ashton Road and milepost SW 884.70, and between milepost AZA 930.30 and milepost AZA 928.21 on the north side of State Highway 780 (Fruitville

400 (Sub-No. 7X)), filed March 8, 2019).  Sarasota County then asked the Board to invoke section 8(d) of the Trails Act to establish the Northern Segment of the Legacy Trail.  See **Exhibit 8** (letter of April 22, 2019, requesting interim trail use, STB Docket No. AB 400 (Sub No. 7X)).

26.    The railroads told the Board in the railroads' application to abandon the railway line that "No local or overhead traffic has moved over the Subject Line since prior to 2007, a period of more than ten years."  **Exhibit 7** (*Abandonment Petition*, STB Docket No. AB-400 (Sub-No. 7X))), p. 3.  The railroads' statements to the Board are made under oath and affirmed.  See 49 C.F.R. §1104.4(b) (documents filed with the Surface Transportation Board containing allegations of fact must be "verified...under oath by the person, in whose behalf it is filed").

27.    Under Florida state law and the terms of the right-of-way easement Adrian Honoré granted Seaboard Railway in 1910, Seaboard and its successor-railroads did not own the land across which the railway line was constructed.  The only interest Seaboard and its successor-railroads had was a right-of-way easement allowing the railroads to operate a railway line across the strip of land.  The railroads' interest in the land could not be transferred to a non-railroad and did not include the right to use the land for any purpose other than the operation of a railway line. See *East Alabama Ry. Co. v. Doe,* 114 U.S. 340, 354 (1885) ("The grant to the 'assigns' of the [railroad] corporation cannot be construed as extending to any assigns except one who should be the assignee of its franchise to establish and run a railroad.").  The railroads' right-of-way easement terminated when the railroads no longer used the strip of land for a railway line.  See *Brandt*, 572 U.S. at 104-05.

28.    The Seaboard Air Line Railway and its successor-railroads could not sell or convey an interest in land they did not own.  See *Castillo v. United States*, 952 F.3d 1311, 1324 (Fed. Cir.

---

Road) within the City of Sarasota, Sarasota County, Florida, with the remainder lying within unincorporated Sarasota County.

2020) ("Under Florida law, the 1937 quitclaim deed conveyed only such 'title or interest as possessed by the grantor...at the time of the making of the deed.'") (quoting *Florida East Coast Ry. Co. v. Patterson*, 593 So. 2d 575, 577 (Fla. Ct. App. 1992)).  See also *Monroe County Comm'n v. Nettles*, 288 So.3d 452, 459 (Ala. 2019) ("the quitclaim deed conveyed nothing to the Commission because the railroad, at the time of conveyance, had nothing to transfer").

29.    On May 14, 2019, the Board invoked the federal Trails Act and issued an order granting the railroad's request to abandon the segment of the Sarasota to Venice railway line between Ashton Road and Fruitville Road.  The Board also invoked section 8(d) of the Trails Act and imposed a new easement across these owners' land.  See **Exhibit 9** (2019 NITU).  The Board's order provided that "Use of the right-of-way for trail purposes is subject to possible future reconstruction and reactivation of the right-of-way for rail service." *Id.* at 2.

30.    But for the federal Surface Transportation Board's invocation of the federal Trails Act imposing this new easement across their land, these Sarasota County landowners would have enjoyed unencumbered title to their property and had the exclusive right to use and occupy their land and to exclude others from the land.

31.    A landowner's right to exclude others from the owner's land is an essential feature of private property.  *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831 (1987) ("We have repeatedly held that, as to property reserved by its owner for private use, 'the right to exclude [others is] "one of the most essential sticks in the bundle of rights that are commonly characterized as property.'"") (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 433 (1982), and *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)).

32.    The Supreme Court has reminded lower courts that adherence to precedent and respect for the principle of stare decisis is of particular importance in cases, such as this one, that involve interests in real property.  See *Leo Sheep Co. v. United States*, 440 U.S. 668, 687-88 (1979)

("This Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and we are unwilling to upset settled expectations to accommodate some ill-defined power to construct public thoroughfares without compensation."). In THE LAW OF JUDICIAL PRECEDENT, Bryan Garner and his renowned co-authors, including (then-)circuit judges Neil Gorsuch, Brett Kavanaugh, William H. Pryor, Jr., and Jeffrey Sutton, instructed,

> The "rule-of-property doctrine…holds that stare decisis applies with 'peculiar force and strictness' to decisions governing real property…. Stability in rules governing property interests is particularly important because those rules create unusually strong reliance interests…. As the Supreme Court explained in a mid-19th-century case: 'Where questions arise which affect titles to land it is of great importance to the public that when they are once decided they should no longer be considered open. Such decisions become rules of property, and many titles may be injuriously affected by their change.'"[15]

**C.     Because the federal government violated the Constitution and took private property without paying the owners, the federal government's taking of private property for the Legacy Trail has been the subject of decades of litigation.**

33.     The Southern Segment of the Legacy Trail was the subject of the earlier lawsuits brought by owners whose land was taken for this segment of the Legacy Trail. Judge Mary Ellen Coster Williams presided over these cases. In these earlier Trails Act cases this Court found the federal government unconstitutionally took private property when the Board issued an order invoking the Trails Act. See *Rogers*, 90 Fed. Cl. at 432; *Childers*, 116 Fed. Cl. at 497; *McCann Holdings*, 111 Fed. Cl. at 614. The owners of the land taken for the Southern Segment of the Legacy Trail were ultimately paid for that land the government took from them. This Court also found that the taking of private property for the Legacy Trail took the entire value of that land encumbered by the easement and the market value of the owners' remaining adjoining residential property was devalued by more than thirty percent. See *Childers*, 116 Fed. Cl. at 524, 541, 580, 582, 588 (plaintiffs entitled to recover compensation of 99% of the fee interest value). See also

---

[15] *Id.* at 421-22 (quoting *Minnesota Mining Co. v. National Mining Co.*, 70 U.S. 332, 334 (1865)).

*McCann Holdings*, 111 Fed. Cl. at 626 ("the parties agree that the Government took 99% of the value of the land underlying the corridor").[16]  See also *Jackson v. United States*, 155 Fed. Cl. 689, 702 (2021) ("In Rails-to-Trails cases, the Court has consistently held that the owners of land subject to a trail easement retain virtually no rights in the encumbered land and awarded the plaintiffs the fee simple value of the encumbered parcel.") (citing, *inter alia*, *Childers*, 116 Fed. Cl. at 524, and *McCann Holdings*, 111 Fed. Cl. at 626).

34.    After the Board issued its third order in March 2019, extending the Legacy Trail another seven miles north between Ashton Road and Fruitville Road, the owners of more than two hundred properties taken for this Northern Segment of the Legacy Trail sued the federal government seeking compensation for their property taken for this extension of the Legacy Trail. See *4023 Sawyer Road I, LLC v. United States*, No. 19-757, and *Barron v. United States*, No. 21-2181.

35.    The plaintiff-landowners bringing this lawsuit own property the federal government took for the northern extension of the Legacy Trail.

36.    In *Preseault I*, 494 U.S. at 8, the Supreme Court held that the language of 16 U.S.C. §1247(d) "gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests."  Justices O'Connor, Scalia, and Kennedy concurred in *Preseault I* to emphasize that "[p]roperty interests...are not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source

---

[16] The federal government's appraiser in the *McCann* and *Childers* litigation was John Underwood. Underwood's appraisal reports in that litigation stated, "The permanent easement would not have allowed development within the easement area. . . As a result, it's my opinion that the permanent easement takes 99 percent of the value of the area encumbered by the easement." *Jackson v. United States*, 2021 WL 3891002, at *11 (Fed. Cl. Aug. 31, 2021).

such as state law.'"  *Id.* at 20 (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001 (1984), and *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980)).

37.      In *Preseault II* the Federal Circuit, sitting *en banc*, held the Takings Clause of the Fifth Amendment requires the federal government to pay landowners for the private property the federal government takes when the Board invokes section 8(d) of the Trails Act.  100 F.3d at 1531 ("[W]e conclude that the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government."  See also *Toews v. United States*, 376 F.3d 1371, 1376-77 (Fed. Cir. 2004) ("it appears beyond cavil that use of these easements for a recreational trail—for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway—is not the same use made by a railroad, involving tracks, depots, and the running of trains").

38.      The Federal Circuit held, the federal government's liability for a Trails Act taking turns upon three points.  See *Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009) (citing and summarizing *Preseault II*, 100 F.3d at 1533).

> (1) [W]ho owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate;
>
> (2) [I]f the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and
>
> (3) [E]ven if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).[17]

---

[17] The third point in this inquiry (whether the easement was abandoned) only arises if the right-of-way easement originally granted the railroad included a right for a non-railroad to use the land for a public recreational trail.  This third inquiry is not applicable here because Adrian Honoré's 1910 easement did not grant the public the right to use the strip of land for recreation and, even more, explicitly prohibited any use other than the operation of a railway.

39.     In *Rogers*, this Court determined the interest Adrian Honoré granted Seaboard Air Line Railway in 1910 was an easement to use the strip of land for the operation of a railroad and that, when Seaboard and its successor-railroads no longer ran trains over the strip of land, the easement terminated.  90 Fed. Cl. at 432.  See also *Brandt*, 572 U.S. at 105; RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES, *supra*, n. 13; Ely, RAILROADS & AMERICAN LAW, *supra* n. 13, pp. 197-98.

40.     By reason of the Board's order and the federal Trails Act, Sarasota County now claims exclusive ownership of the land subject to the Board's order invoking the federal Trails Act.  In reliance upon the federal government's designation of Sarasota County as the trail-sponsor and the Board's invocation of the Trails Act, Sarasota County has constructed and is now operating a public recreational trail across these owners' land.

41.     In reliance upon the federal Trails Act, Sarasota County claims it now has exclusive possession and dominion of these owners' land and can demand owners to remove any existing structures from the land.  Sarasota County is also entering these owners' land demolishing structures that have existed for decades, threatening the owners with civil and criminal penalties and demanding the owners agree to pay Sarasota County rent or a "license fee" to use land the owner owns.  The "encroachments" Sarasota County demands owners remove include in-ground swimming pools, fences, sheds, septic drain fields, and other improvements that lawfully existed on these owners' private property for decades.

42.     When the Board issued its order invoking the Trails Act the Board knew it was taking these owners' private property.  The Board knew this Court had already ruled in *Rogers*, and the Justice Department had already admitted, that the Seaboard Air Line Railway did not own the land.  The federal government knew that, when the Board issued an order invoking the Trails Act, the Board was taking private property in violation of the United States Constitution.

## THE PARTIES

**A.    The Sarasota County, Florida Landowners.**

43.    The individuals, families and small businesses bringing this lawsuit are the present-day owners of fifteen properties in Sarasota County Florida which the federal government took for the northern extension of the Legacy Trail.  The owners of these properties are the successors-in-title to the original landowners that granted the railroad an easement for a right-of-way across their land.  Each of these owners holds title to the fee estate in that land which is now subject to the Board's May 14, 2019, order invoking section 8(d) of the Trails Act.  The Board's invocation of the Trails Act "destroyed" and "effectively eliminated" these owners' private property. The federal government has not paid any of these owners for that property the federal government took.

### *(1)    Jeffrey and Anna Heck (the Heck family)*

44.    Jeffrey and Anna Heck purchased their home in Sarasota on December 13, 2016. See **Exhibit 10** (deed recorded in the Sarasota Recorder of Deed's office as instrument number 2016154642) and **Exhibit 11** (title affidavit in the Sarasota Recorder of Deed's office as instrument number 2016154641).  The Sarasota County Tax Assessor lists the Heck family's property as parcel number 0061-06-0005.  See **Exhibit 12** (tax record for this property).  These tax records demonstrate the Heck family owned this property in May 2019 when the federal government issued its order taking the property.

45.    The Sarasota County Geographic Information System (GIS) shows the Legacy Trail encumbers the Heck family's property.  See **Exhibit 13** (GIS snapshot from the Sarasota County Property Appraiser's site).  The location of the Heck family's property shows the relevant original conveyance was through the Sarasota Land Company.  See **Exhibits 2-A** (original conveyance document) and **2-B** (transcription of the original conveyance document).  This conveyance granted

the railroad only an easement to use the strip of land for a railway line and not title to the fee simple estate in the land.

46.     The Heck family owned the land the federal government took for public recreation and a future railway line.

47.     The Heck family owned their property on May 14, 2019, which is when the Board issued its order invoking section 8(d) of the federal Trails Act and imposed a federal rail-trail corridor easement across the property.

48.     The federal government has not paid (nor offered to pay) the Heck family for that property the government took.

### *(2)     Reyna and Osvaldo Castillo (the Castillo family)*

49.     Reyna and Osvaldo Castillo purchased their home in Sarasota on September 30, 2009.  See **Exhibit 14** (deed recorded in the Sarasota Recorder of Deed's office as instrument number 2009123048) and **Exhibit 15** (Sarasota County Property Appraiser's report).  The Sarasota County Tax Assessor lists the Castillo family's property as parcel number 2034-02-0016.  See **Exhibit 16** (tax record for this property).  These tax records demonstrate the Castillo family owned this property in May 2019 when the federal government issued its order taking the property.

50.     The Sarasota County GIS shows the Legacy Trail encumbers the Castillo family's property.  See **Exhibit 17** (GIS snapshot from the Sarasota County Property Appraiser's site).  The location of the Castillo family's property shows the relevant original conveyance was through the Florida Mortgage & Investment Company.  See **Exhibits 5-A** (original conveyance document) and **5-B** (transcription of the original conveyance document).  This conveyance granted the railroad

only an easement to use the strip of land for a railway line and not title to the fee simple estate in the land.

51.     Reyna and Osvaldo Castillo owned the land the federal government took for public recreation and a future railway line.

52.     Reyna and Osvaldo Castillo owned this property on May 14, 2019, which is when the Board issued its order invoking section 8(d) of the federal Trails Act and imposed a federal rail-trail corridor easement across the property.

53.     The federal government has not paid (nor offered to pay) the Castillo family for that property the government took.

### (3)     *Mary Cournoyer*

54.     Mary Cournoyer purchased her home in Sarasota on September 29, 1987.  See **Exhibit 18** (deed recorded in the Sarasota Recorder of Deed's office as instrument number 806300) and **Exhibit 19** (Sarasota County Property Appraiser's report).  The Sarasota County Tax Assessor lists Mary Cournoyer's property as parcel number 2034-02-0024.  See **Exhibit 20** (2018 tax record for this property).  These tax records demonstrate Mary Cournoyer owned this property in May 2019 when the federal government issued its order taking the property.

55.     The Sarasota County GIS shows the Legacy Trail encumbers Mary Cournoyer's property.  See **Exhibit 21** (GIS snapshot from the Sarasota County Property Appraiser's site).  The location of Mary Cournoyer's property shows the relevant original conveyance was through the Florida Mortgage & Investment Company.  See **Exhibits 5-A** (original conveyance document) and **5-B** (transcription of the original conveyance document).  This conveyance granted the railroad

only an easement to use the strip of land for a railway line and not title to the fee simple estate in the land.

56.    Mary Cournoyer owned the land the federal government took for public recreation and a future railway line.

57.    Mary Cournoyer owned this property on May 14, 2019, which is when the Board issued its order invoking section 8(d) of the federal Trails Act and imposed a federal rail-trail corridor easement across the property.

58.    The federal government has not paid (nor offered to pay) Mary Cournoyer for that property the government took.

### (4)    N. Kelly and Cornelia Gray (the Gray family)

59.    N. Kelly and Cornelia Gray purchased their home in Sarasota on September 15, 2016.  See **Exhibit 22** (deed recorded in the Sarasota Recorder of Deed's office as instrument number 2016115399) and **Exhibit 23** (Sarasota County Property Appraiser's report).  The Sarasota County Tax Assessor lists the Gray family's property as parcel number 2029-03-0015.  See **Exhibit 24** (tax record for this property).  These tax records demonstrate the Gray family owned this property in May 2019 when the federal government issued its order taking the property.

60.    The Sarasota County GIS shows the Legacy Trail encumbers the Gray family's property.  See **Exhibit 25** (GIS snapshot from the Sarasota County Property Appraiser's site).  The location of the Gray family's property shows the railroad obtained its interest to use the strip of land by virtue of a 1926 Condemnation Decree.  See **Exhibit 1** (condemnation documents).  This Condemnation Decree granted the railroad only an easement to use the strip of land for a railway line and did not convey title to the fee simple estate in the land to use the railroad.

61.     The Gray family owned the land the federal government took for public recreation and a future railway line.

62.     The Gray family owned this property on May 14, 2019, which is when the Board issued its order invoking section 8(d) of the federal Trails Act and imposed a federal rail-trail corridor easement across the property.

63.     The federal government has not paid (nor offered to pay) the Gray family for that property the government took.

**(5)     *James Gulsby, Jr.***

64.     James Gulsby, Jr. purchased his home in Sarasota on April 5, 1991.  See **Exhibit 26** (deed recorded in the Sarasota Recorder of Deed's office as instrument number 91033738) and **Exhibit 27** (Sarasota County Property Appraiser's report).  The Sarasota County Tax Assessor lists Gulsby's property as parcel number 0061-15-0019.  See **Exhibit 28** (tax record for this property). These tax records demonstrate James Gulsby, Jr. owned this property in May 2019 when the federal government issued its order taking the property.

65.     The Sarasota County Geographic Information System shows the Legacy Trail encumbers James Gulsby, Jr.'s property.  See **Exhibit 29** (GIS snapshot from the Sarasota County Property Appraiser's site).  The location of James Gulsby, Jr.'s property shows the relevant original conveyance was through the Sarasota Land Company.  See **Exhibits 2-A** (original conveyance document) and **2-B** (transcription of the original conveyance document).  This conveyance granted the railroad only an easement to use the strip of land for a railway line and not title to the fee simple estate in the land.

66.     James Gulsby, Jr. owned the land the federal government took for public recreation and a future railway line.

67.     James Gulsby, Jr. owned this property on May 14, 2019, which is when the Board issued its order invoking section 8(d) of the federal Trails Act and imposed a federal rail-trail corridor easement across the property.

68.     The federal government has not paid (nor offered to pay) James Gulsby, Jr. for that property the government took.

### *(6)     Leslie and Larisa Krajcovic (the Krajcovic family)*

69.     Leslie and Larisa Krajcovic purchased their home in Sarasota on August 16, 2017. See **Exhibit 30** (deed recorded in the Sarasota Recorder of Deed's office as instrument number 2017105249) and **Exhibit 31** (Sarasota County Property Appraiser's report).  The Sarasota County Tax Assessor lists the Gray family's property as parcel number 0060-06-0082.  See **Exhibit 32** (tax record for this property).  These tax records demonstrate the Krajcovic family owned this property in May 2019 when the federal government issued its order taking the property.

70.     The Sarasota County GIS shows the Legacy Trail encumbers the Krajcovic family's property.  See **Exhibit 33** (GIS snapshot from the Sarasota County Property Appraiser's site).  The location of the Krajcovic family's property shows the relevant original conveyance was through the Sarasota Land Company.   See **Exhibits 2-A** (original conveyance document) and **2-B** (transcription of the original conveyance document).  This conveyance granted the railroad only an easement to use the strip of land for a railway line and not title to the fee simple estate in the land.

71.     The Krajcovic family owned the land the federal government took for public recreation and a future railway line.

72.     The Krajcovic family owned this property on May 14, 2019, which is when the Board issued its order invoking section 8(d) of the federal Trails Act and imposed a federal rail-trail corridor easement across the property.

73.     The federal government has not paid (nor offered to pay) the Krajcovic family for that property the government took.

### (7)      *Vitaliy and Olga Osipov (the Osipov family)*

74.     Vitaliy and Olga Osipov purchased their home in Sarasota.  See **Exhibit 34** (Sarasota County Property Appraiser's report).  The Sarasota County Tax Assessor lists the Osipov family's property as parcel number 0054-04-0014.  See **Exhibit 35** (tax record for this property). These tax records demonstrate the Osipov family owned this property in May 2019 when the federal government issued its order taking the property.

75.     The Sarasota County GIS shows the Legacy Trail encumbers the Osipov family's property.  See **Exhibit 36** (GIS snapshot from the Sarasota County Property Appraiser's site).  The location of the Osipov family's property shows the relevant original conveyance was through the Florida Mortgage & Investment Company.  See **Exhibits 5-A** (original conveyance document) and **5-B** (transcription of the original conveyance document).  This conveyance granted the railroad only an easement to use the strip of land for a railway line and not title to the fee simple estate in the land.

76.     The Osipov family owned the land the federal government took for public recreation and a future railway line.

26

77.     The Osipov family owned this property on May 14, 2019, which is when the Board issued its order invoking section 8(d) of the federal Trails Act and imposed a federal rail-trail corridor easement across the property.

78.     The federal government has not paid (nor offered to pay) the Osipov family for that property the government took.

### *(8)     Marland Phillips*

79.     Marland Phillips purchased his home in Sarasota on October 4, 2010.  See **Exhibit 37** (deed recorded in the Sarasota Recorder of Deed's office as instrument number 2010121027) and **Exhibit 38** (Sarasota County Property Appraiser's report).  The Sarasota County Tax Assessor lists Marland Phillips's property as parcel number 0052-12-0020.  See **Exhibit 39** (tax record for this property).  These tax records demonstrate Marland Phillips owned this property in May 2019 when the federal government issued its order taking the property.

80.     The Sarasota County GIS shows the Legacy Trail encumbers Marland Phillips's property.  See **Exhibit 40** (GIS snapshot from the Sarasota County Property Appraiser's site).  The location of Marland Phillips's property shows the relevant original conveyance was through A.C. Clough.  See **Exhibits 3-A** (original conveyance document) and **3-B** (transcription of the original conveyance document).  The railroad held only an easement to use this strip of land for a railway line and did not own the fee simple estate in the land.

81.     Marland Phillips owned the land the federal government took for public recreation and a future railway line.

82.    Marland Phillips owned this property on May 14, 2019, which is when the Board issued its order invoking section 8(d) of the federal Trails Act and imposed a federal rail-trail corridor easement across the property.

83.    The federal government has not paid (nor offered to pay) Marland Phillips for that property the government took.

### (9)    *Cecily Reading*

84.    Cecily Reading purchased her home in Sarasota on March 31, 2018.  See **Exhibit 41** (deed recorded in the Sarasota Recorder of Deed's office as instrument number 2018043247) and **Exhibit 42** (Sarasota County Property Appraiser's report).  The Sarasota County Tax Assessor lists Cecily Reading's property as parcel number 0054-03-0007.  See **Exhibit 43** (tax record for this property).  These tax records demonstrate Cecily Reading owned this property in May 2019 when the federal government issued its order taking the property.

85.    The Sarasota County GIS shows the Legacy Trail encumbers Cecily Reading's property.  See **Exhibit 44** (GIS snapshot from the Sarasota County Property Appraiser's site).  The location of Cecily Reading's property shows the relevant original conveyance was through Moses Neihardt.  See **Exhibits 4-A** (original conveyance document) and **4-B** (transcription of the original conveyance document).  This conveyance granted the railroad only an easement to use the strip of land for a railway line and not title to the fee simple estate in the land.

86.    Cecily Reading owned the land the federal government took for public recreation and a future railway line.

28

87.    Cecily Reading owned this property on May 14, 2019, which is when the Board issued its order invoking section 8(d) of the federal Trails Act and imposed a federal rail-trail corridor easement across the property.

88.    The federal government has not paid (nor offered to pay) Cecily Reading for that property the government took.

### (10)    *Rosemary Properties, LLC (Rosemary Properties)*

89.    Rosemary Properties, LLC purchased their property in Sarasota on July 19, 2017. See **Exhibit 45** (deed recorded in the Sarasota Recorder of Deed's office as instrument number 2017096608) and **Exhibit 46** (Sarasota County Property Appraiser's report).  The Sarasota County Tax Assessor lists Rosemary Properties' property as parcel number 0060-06-0078.  See **Exhibit 47** (tax record for this property).  These tax records demonstrate Rosemary Properties owned this property in May 2019 when the federal government issued its order taking the property.

90.    The Sarasota County GIS shows the Legacy Trail encumbers Rosemary Properties' property.  See **Exhibit 48** (GIS snapshot from the Sarasota County Property Appraiser's site).  The location of Rosemary Properties' property shows the relevant original conveyance was through the Sarasota Land Company.  See **Exhibits 2-A** (original conveyance document) and **2-B** (transcription of the original conveyance document).  This conveyance granted the railroad only an easement to use the strip of land for a railway line and not title to the fee simple estate in the land.

91.    Rosemary Properties owned the land the federal government took for public recreation and a future railway line.

92.    Rosemary Properties owned this property on May 14, 2019, which is when the Board issued its order invoking section 8(d) of the federal Trails Act and imposed a federal rail-trail corridor easement across the property.

93.    The federal government has not paid (nor offered to pay) Rosemary Properties for that property the government took.

### *(11)    Daniel and Nicole Starostecki (the Starostecki family)*

94.    Daniel and Nicole Starostecki purchased their property in Sarasota on March 21, 2008.  See **Exhibit 49** (deed recorded in the Sarasota Recorder of Deed's office as instrument number 2008039452) and **Exhibit 50** (Sarasota County Property Appraiser's report).  The Sarasota County Tax Assessor lists the Staroskecki family's property as parcel number 2029-14-0007.  See **Exhibit 51** (tax record for this property).  These tax records demonstrate Rosemary Properties owned this property in May 2019 when the federal government issued its order taking the property.

95.    The Sarasota County GIS shows the Legacy Trail encumbers the Starostecki family's property.  See **Exhibit 52** (GIS snapshot from the Sarasota County Property Appraiser's site).  The location of the Starostecki family's property shows the railroad obtained its interest to use the strip of land by virtue of a 1926 Condemnation Decree.  See **Exhibit 1** (condemnation documents).  This Condemnation Decree granted the railroad only an easement to use the strip of land for a railway line and did not convey title to the fee simple estate in the land to use the railroad.

96.    The Starostecki family owned the land the federal government took for public recreation and a future railway line.

97. The Starostecki family owned this property on May 14, 2019, which is when the Board issued its order invoking section 8(d) of the federal Trails Act and imposed a federal rail-trail corridor easement across the property.

98. The federal government has not paid (nor offered to pay) the Starostecki family for that property the government took.

### (12) Richard and Jacqueline Stuart (the Stuart family)

99. Richard and Jacqueline Stuart purchased their property in Sarasota on August 30, 2005. See **Exhibit 53** (deed recorded in the Sarasota Recorder of Deed's office as instrument number 2005196431) and **Exhibit 54** (Sarasota County Property Appraiser's report). The Sarasota County Tax Assessor lists the Stuart family's property as parcel number 0060-14-0078. See **Exhibit 55** (tax record for this property). These tax records demonstrate the Stuart family owned this property in May 2019 when the federal government issued its order taking the property.

100. The Sarasota County GIS shows the Legacy Trail encumbers the Stuart family's property. See **Exhibit 56** (GIS snapshot from the Sarasota County Property Appraiser's site). The location of the Stuart family's property shows the relevant original conveyance was through the Sarasota Land Company. See **Exhibits 2-A** (original conveyance document) and **2-B** (transcription of the original conveyance document).

101. The Stuart family owned the land the federal government took for public recreation and a future railway line.

102. The Stuart family owned this property on May 14, 2019, which is when the Board issued its order invoking section 8(d) of the federal Trails Act and imposed a federal rail-trail corridor easement across the property.

103.    The federal government has not paid (nor offered to pay) the Stuart family for that property the government took.

### (13)    *Mark Theiler*

104.    Mark Theiler purchased his property in Sarasota on March 13, 2009.  See **Exhibit 57** (deed recorded in the Sarasota Recorder of Deed's office as instrument number 2009031523) and **Exhibit 58** (Sarasota County Property Appraiser's report).  The Sarasota County Tax Assessor lists Mark Theiler's property as parcel number 0060-11-0085.  See **Exhibit 59** (tax record for this property).  These tax records demonstrate Rosemary Properties owned this property in May 2019 when the federal government issued its order taking the property.

105.    The Sarasota County GIS shows the Legacy Trail encumbers Mark Theiler's property.  See **Exhibit 60** (GIS snapshot from the Sarasota County Property Appraiser's site).  The location of Mark Theiler's property shows the relevant original conveyance was through the Sarasota Land Company.   See **Exhibits 2-A** (original conveyance document) and **2-B** (transcription of the original conveyance document).  This conveyance granted the railroad only an easement to use the strip of land for a railway line and not title to the fee simple estate in the land.

106.    Mark Theiler owned the land the federal government took for public recreation and a future railway line.

107.    Mark Theiler owned this property on May 14, 2019, which is when the Board issued its order invoking section 8(d) of the federal Trails Act and imposed a federal rail-trail corridor easement across the property.

108.    The federal government has not paid (nor offered to pay) Mark Theiler for that property the government took.

### *(14)    Phong Thanh Tran and Giang Thu Vo Ho (the Tran family)*

109.    Phong Thanh Tran and Giang Thu Vo Ho purchased their property in Sarasota on May 17, 2017.  See **Exhibit 61** (deed recorded in the Sarasota Recorder of Deed's office as instrument number 2017063457) and **Exhibit 62** (Sarasota County Property Appraiser's report). The Sarasota County Tax Assessor lists the Tran family's property as parcel number 0060-03-0042. See **Exhibit 63** (tax record for this property).  These tax records demonstrate the Tran family owned this property in May 2019 when the federal government issued its order taking the property.

110.    The Sarasota County GIS shows the Legacy Trail encumbers the Tran family's property.  See **Exhibit 64** (GIS snapshot from the Sarasota County Property Appraiser's site).  The location of the Tran family's property shows the relevant original conveyance was through the Sarasota Land Company.   See **Exhibits 2-A** (original conveyance document) and **2-B** (transcription of the original conveyance document).  This conveyance granted the railroad only an easement to use the strip of land for a railway line and not title to the fee simple estate in the land.

111.    The Tran family owned the land the federal government took for public recreation and a future railway line.

112.    The Tran family owned this property on May 14, 2019, which is when the Board issued its order invoking section 8(d) of the federal Trails Act and imposed a federal rail-trail corridor easement across the property.

113.    The federal government has not paid (nor offered to pay) the Tran family for that property the government took.

### (15)    *Jeffrey and Ann Wall (the Wall family)*

114.    Jeffrey and Ann Wall purchased their property in Sarasota.  See **Exhibit 65** (Sarasota County Property Appraiser's report).  The Sarasota County Tax Assessor lists the Wall family's property as parcel number 2029-16-0073.  See **Exhibit 66** (tax record for this property).  These tax records demonstrate the Wall family owned this property in May 2019 when the federal government issued its order taking the property.

115.    The Sarasota County GIS shows the Legacy Trail encumbers Rosemary Properties' property.  See **Exhibit 67** (GIS snapshot from the Sarasota County Property Appraiser's site).  The location of Rosemary Properties' property shows the relevant original conveyance was through O.H. Pendley.  See **Exhibits 6-A** (original conveyance document) and **6-B** (transcription of the original conveyance document).  This conveyance granted the railroad only an easement to use the strip of land for a railway line and not title to the fee simple estate in the land.

116.    The Wall family owned the land the federal government took for public recreation and a future railway line.

117.    The Wall family owned this property on May 14, 2019, which is when the Board issued its order invoking section 8(d) of the federal Trails Act and imposed a federal rail-trail corridor easement across the property.

118.    The federal government has not paid (nor offered to pay) the Wall family for that property the government took.

**B.    The Defendant.**

119.    The United States of America is the defendant.  The federal Surface Transportation Board (the Board) is an agency of the federal government and is the successor to the Interstate Commerce Commission (ICC).[18]  The federal government took these Florida owners' private property but did not pay these owners just compensation as the Takings Clause of the Fifth Amendment requires the government to do.  The federal Surface Transportation Board also failed to comply with the federal Uniform Relocation Assistance Act of 1970, 42 U.S.C. §4654(c) (URA) (Pub. L. 91-646; 84 Stat. 1894).

120.    The Supreme Court held that the federal government's invocation of the Trails Act is a taking of private property for which the Constitution requires the federal government to pay the landowner "just compensation."  See *Preseault I*, 494 U.S. at 8.

121.    The Federal Circuit, sitting *en banc*, explained that Trails Act takings were the responsibility of the federal government, stating, "we conclude that the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government. … The Federal Government authorized and controlled the behavior of the State [here Sarasota County] in this matter, and the consequences properly fall there." *Preseault II*, 100 F.3d at 1531.

122.    Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. 4654(c) (URA), which provides, "[t]he court rendering a judgment for the plaintiff...awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will in the opinion of the court or

---

[18] See I.C.C. Termination Act of 1995, Pub. L. 104-88, 109 Stat. 803.

the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees....".

123.    Congress adopted the URA, that requires the federal Surface Transportation Board, as a "displacing agency," to make owners whose property is taken under the federal programs whole and comply with the laws governing federal acquisition of private property.  The Board failed to comply with these laws.

## CAUSES OF ACTION

### COUNT I

*An action for "Just Compensation" under the Takings Clause*
*of the Fifth Amendment to the United States Constitution.*

124.    The federal government took these Florida owners' private property.  The Takings Clause of the Fifth Amendment of our Constitution requires the federal government to pay these owners just compensation when the government takes private property.  See U.S. CONST., AMEND. V ("No person shall be…deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.").

125.    Congress amended the Trails Act in 1983 for the explicit purpose of authorizing the Interstate Commerce Commission (now the Surface Transportation Board) to take an owner's land to establish rail-trail corridor easements under the federal government's perpetual jurisdiction and authority.  Congress intended section 8(d), when invoked, to encumber the owner's private property with a rail-trail corridor easement allowing the public to use the owners' land for recreation and a railroad to build a railway line across the owner's land in the future.  The Board's

order invoking the Trails Act also subjected the owner's land to the Board's perpetual jurisdiction.[19]

126.    In *Preseault I*, the Supreme Court found that by exercising the federal government's eminent domain power, the Interstate Commerce Commission (now the Board) could extinguish and destroy and owner's state-law property interests and take private property for public recreation and so-called "railbanking."  494 U.S. at 8.  The Board's invocation of the Trails Act "destroys" and "essentially eliminates" the owner's state law rights to the land subject to the Board's order.[20]

127.    This Court has consistently held that the taking of private property for the Legacy Trail took the entire value of that land encumbered by the easement and the market value of the owners' remaining adjoining residential property was devalued by more than thirty percent.  See *Childers*, 116 Fed. Cl. at 524, 541, 580, 582, 588 (plaintiffs entitled to recover compensation of 99% of the fee interest value).  See also *McCann Holdings*, 111 Fed. Cl. at 626 ("the parties agree that the Government took 99% of the value of the land underlying the corridor").   See also *Jackson*, 155 Fed. Cl. at 702 ("In Rails-to-Trails cases, the Court has consistently held that the owners of land subject to a trail easement retain virtually no rights in the encumbered land and

---

[19]  See *Preseault I* and *Trevarton v. South Dakota,* 817 F.3d 1081, 1087 (8th Cir. 2016) (holding the invocation of section 8(d) imposes a new and different easement upon the owner's land).  See also *Citizens Against Rails-to-Trails v. Surface Transp. Bd*., 267 F.3d 1144, 1149 (D.C. Cir. 2001). and *Nat'l Wildlife Found. v. Interstate Commerce Comm'n*, 850 F.2d 694, 697-98 (D.C. Cir. 1988) (explaining that Congress intended to extinguish owners' state-law property rights).

[20] "It is settled law that a Fifth Amendment taking occurs in Rails-to-Trails cases when government action *destroys* state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." *Ladd I*, 630 F.3d at 1019 (citing *Ellamae Phillips*, 564 F.3d at 1373) (emphasis added).  See also *Caldwell*, 391 F.3d at 1228 ("a Fifth Amendment taking occurs when, pursuant to the Trails Act, state law reversionary interests are *effectively eliminated* in connection with a conversion of a railroad right-of-way to trail use") (citing *Preseault II*, 100 F.3d at 1543) (emphasis added).

37

awarded the plaintiffs the fee simple value of the encumbered parcel.") (citing, *inter alia*, *Childers*, 116 Fed. Cl. at 524, and *McCann Holdings*, 111 Fed. Cl. at 626).

128.    The Supreme Court held the Trails Act "gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests.  While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations.  State law generally governs the disposition of reversionary interests .…" *Preseault I*, 494 U.S. at 7.  But importantly, the Supreme Court held the federal government's exercise of this power to take owners' private property was only constitutional because the federal government must also justly compensate the owner for that property the government took.  In other words, the constitutionality of the Trails Act was predicated upon the absolute obligation of the federal government to fully compensate the owner whose property was taken for the federal rail-trail corridor.  See *id*.

129.    The Federal Circuit followed *Preseault I*, and sitting *en banc*, ruled that, "if [an owner has] interests under state property law that have traditionally been recognized and protected from governmental expropriation, and if, over their objection, the Government chooses to occupy or otherwise acquire those interests, the Fifth Amendment compels compensation. … The taking of possession of the lands owned by the [owner] for use as a public trail was in effect a taking of a new easement for that new use, for which the landowners are entitled to compensation. … [This is] a new easement for the new use, constituting a physical taking of the right of exclusive possession that belonged to the [landowner]."  100 F.3d at 1550.  Judge Rader further explained,

> while federal legislation may alter the terms of the [a landowner's] property rights defined and created by state law, it cannot do so without giving just compensation. The Federal Government has the power to enact legislation that affects the [owner's] right to freely use or possess land.  But the Government cannot use this power for uncompensated, piecemeal usurpation of the rights of property owners,

38

such that with each transfer of the property the purchaser loses sticks within the original bundle of rights yet remains without Constitutional recourse. Simply, when the Federal Government intrudes upon a property owner's right of use or possession of property, the Federal Government must pay just compensation.

*Id.* at 1553.

130. The Federal Circuit further held:

[W]e conclude that the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government. … In the case before us there was a similar physical entry upon the private lands of the [property owners], acting under the Federal Government's authority pursuant to the ICC's [now STB's] Order. That it was for a valued public use is not the issue. We have here a straightforward taking of private property for a public use for which just compensation must be paid.

*Preseault II*, 100 F.3d at 1531.

131. In *Ellamae Phillips*, 564 F.3d at 1373, a panel of the Federal Circuit summarized the Federal Circuit's en banc holding in *Preseault II* and noted the federal government's liability in Trails Act taking cases turns upon three questions:

(1) [W]ho owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate;

(2) [I]f the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and

(3) [E]ven if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).[21]

132. The Seaboard Air Line Railway and its successor-railroads did not own the land across which Seaboard built the railway line. The railroad only held a limited easement to use the strip of land for the operation of a railway.

---

[21] See *supra* ¶31. This third inquiry only arises if the original easement granted the right to use the land for public recreation.

39

133.    The present-day Florida landowners bringing this lawsuit:  1) own the land and the railroad held only an easement; 2) the railroad's interest was limited to a right to operate a railway across the strip of land and the railroad did not have any right to sell or transfer the land to a non-railroad for public recreation or railbanking; and 3) the railroad's interest in the right-of-way easement unequivocally terminated when the railroad no longer operated a railway across the strip land and the railway line was abandoned.

134.    An easement for the operation of a railroad is entirely different than an easement for public recreation.  The Federal Circuit explained this fundamental point when it held:

> It is elementary law that if the Government uses (or authorizes the use of—a point to be considered later) an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use. The consent of the railroad to the new use does not change the equation—the railroad cannot give what it does not have.

> And it appears beyond cavil that use of these easements for a recreational trail— for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway—is not the same use made by a railroad, involving tracks, depots, and the running of trains.  The different uses create different burdens. In the one case there was an occasional train passing through (no depots or turntables or other appurtenances are involved on these rights of way). In the other, individuals or groups use the property, some passing along the trail, others pausing to engage in activities for short or long periods of time.  In the one case, the landowner could make such uses of the property as were not inconsistent with the railroad's use, crossing over the tracks, putting a fruit stand on one edge of the property, or whatever.  In the other, the government fenced the trail in such a way as to deny that access.

> Some might think it better to have people strolling on one's property than to have a freight train rumbling through.  But that is not the point.  The landowner's grant authorized one set of uses, not the other.  Under the law, it is the landowner's intention as expressed in the grant that defines the burden to which the land will be subject.  The Government does not dispute this proposition—the Government agrees that, consistent with the state's law, the landowner's grant defines the burden with which the land is burdened.

*Toews*, 376 F.3d at 1376-77.

40

135.    Had the Board not invoked section 8(d) of the Trails Act, these Florida landowners would have held and enjoyed unencumbered title to their land, would have had the exclusive right to use and possess their land free of any easements for public recreation or a railroad and these owners could exclude others from the land.

136.    The federal government took these owners' private property when the Board issued its order invoking section 8(d) of the Trails Act on May 14, 2019. *Caldwell*, 391 F.3d at 1228, *Barclay*, 443 F.3d at 1373, and *Illig*, 274 Fed. Appx. at 883. See also Solicitor General Kagan's Brief for the United States in Opposition to Petition of Writ of Certiorari, *Illig v. United States*, 2009 WL 1526939.

137.    In *Barclay* the Federal Circuit held that an owner's right to compensation in a Trails Act taking arises when the Board first issues its order invoking section 8(d). Judge Dyk of the Federal Circuit wrote:

> The taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting. Abandonment is suspended and the reversionary interest is blocked "when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)" of the Trails Act. We concluded that "[t]he issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right of way. Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU.

*Barclay*, 443 F.3d at 1373.[22]

138.    The government's liability for a Fifth Amendment taking is defined by what the owner lost, not what the taker gained. Justice Holmes explained in *Boston Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910) ("And the question is, What has the owner lost? Not,

---

[22] See also *Ladd I*, 630 F.3d at 1020; *Ladd II*, 713 F.3d at 652.

What has the taker gained?").  See also *First English Evangelical Lutheran Church v. Los Angeles*, 482 U.S. 304, 321-22 (1987) ("a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change") (quoting *Pennsylvania Coal*, 260 U.S. at 416).

139.    The federal government took these owners' right to unencumbered title to their land and these owners lost their state law right to exclude others from their land.  The federal government took these owners' state law property rights when the Board issued an order invoking the Trails Act on May 14, 2019.

140.    The Federal Circuit and the Supreme Court hold the Board's invocation of the Trails Act is the federal government action that takes an owner's state-law right to the owner's land.  In *Ladd I*, 630 F.3d at 1024-25, the Federal Circuit held:

> Hence it is irrelevant that no trail use agreement has been reached and that no recreational trail has been established. …"a taking occurs when the owner is deprived of use of the property...by blocking the easement reversion.  While the taking may be abandoned...by the termination of the NITU[,] the accrual date of a single taking remains fixed." *Caldwell*, 391 F.3d at 1235.  We further explained: "The NITU marks the 'finite start' to either temporary or permanent takings claims by halting abandonment and the vesting of state law reversionary interests when issued." *Id.*  Thus, the NITU forestalls or forecloses the landowners' right to unencumbered possession of the property. *Cf. Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831, (1987) ("To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather...'a mere restriction on its use,' is to use words in a manner that deprives them of all their ordinary meaning.").[23]

---

[23]  Internal citations omitted.  See also *Navajo Nation*, 631 F.3d at 1275, in which the Federal Circuit affirmed its holding in *Ladd I* as "explaining that a takings claim accrues when the government takes action which deprives landowners of 'possession of their property unencumbered by [an] easement,' regardless of whether third parties ever take physical possession of that easement" and its holding in *Caldwell* as "concluding that any taking occurred when the government took action preventing landowners' state law reversionary interests in a railroad right-of-way from vesting, not when subsequent actions by third parties caused the right-of-way to be converted to an interim trail for recreational use."

141. By virtue of the Board invoking section 8(d) of the Trails Act, Seaboard Air Line Railway's successor railroads (Seminole Gulf and CSXT) entered into an agreement with the Trust for Public Land and Sarasota County to transfer the land under the abandoned railroad right-of-way to Sarasota County for a northern extension to the Legacy Trial.

142.    That this land was taken from these owners for a public amenity such as a public recreational trail does not mitigate the federal government's constitutional obligation to justly compensate these owners.  Justice Holmes cautioned, "[w]e are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving that desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal*, 260 U.S. at 415.  Similarly, Justice Black wrote, "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49 (1960).  See also *Monongahela*, 148 U.S. at 324 ("the right to compensation is an incident to the exercise of that power [of eminent domain]; that the one is so inseparably connected with the other that they may be said to exist, not as separate and distinct principles, but as parts of one and the same principle").[24]

143.    The Fifth Amendment requirement of justly compensating an owner from whom the government takes private property requires the government to make the owner whole including: (a) paying the full fair market value of the property taken as of the date it was appropriated by the federal government – fair market value includes not only the value of the land

---

[24] Citing, *inter alia*, *Pumpelly v. Green Bay Co.*, 80 U.S. 166 (1871).

physically confiscated but also any "severance damages" or loss in value to the property owner's remaining property caused by the government's taking; and, (b) compensation necessary to make the owner whole for the government's delay in paying for the property the government took.

144.   The Supreme Court held in *Seaboard*, 261 U.S. at 304,

The compensation to which the owner is entitled is the full and perfect equivalent of the property taken.  It rests on equitable principles and it means substantially that the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken.  He is entitled to the damages inflicted by the taking."[25]

145.   The federal government's obligation to justly compensate the owner arises when the Board first invokes the Trails Act and takes the owner's private property.  In *Knick*, 139 S.Ct. at 2170, the Supreme Court declared, "because a taking without compensation violates the self-executing Fifth Amendment at the time of the taking, the property owner can bring a federal suit at that time."  The Supreme Court continued and held that it has "long recognized that property owners may bring Fifth Amendment claims…as soon as their property has been taken." *Id.* at 2172.

146.   The government must compensate each of these owners for the government's delay in paying the owner for the property on the date the government took each of these owners' property.  This compensation is determined by the owner's loss of use of the money the government should have paid each owner in May 2019 when the government took these owners' property.  That was more than four years ago, and the money the federal government should have paid theses owners in May 2019 has been devalued due to significant inflation.  Thus, the compensation the government must pay should be adjusted for inflation and the owners' loss of

---

[25] Citing *Monongahela*, 148 U.S. at 327.

use of the funds between May 2019 when the government took the owners property and when the government finally pays each owner.

## COUNT II

*An action under the Uniform Relocation Act.*

147. The URA requires the federal government to reimburse these owners all of the "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding." 42 U.S.C. §4654(c).

148. Congress adopted the Uniform Relocation Assistance and Real Property Acquisition Policies Act in 1970 to "ensure that [displaced] persons shall not suffer disproportionate injuries as a result of programs and projects designed for the benefit of the public as a whole and to minimize the hardship of displacement on such persons." 42 U.S.C. §4621(b). "It is the intent of Congress that…uniform procedures for the administration of relocation assistance shall, to the maximum extent feasible, assure that the unique circumstances of any displaced person are taken into account and that persons in essentially similar circumstances are accorded equal treatment under this chapter." *Id.* §4621(c)(2).

149. Senator Edmund Muskie, Chairman of the Senate Committee on Government Operations, opened hearings on the URA, stating:

> In my opinion, this is as high priority a measure as stands before the Senate today. There are more than 50 Federal programs which result in the condemning of land and, literally, the bulldozing of hundreds of thousands of people from their homes and businesses each year. A large number of these people are low-income families. They are the elderly. They are small farmers and small businessmen. Most of their entire lives and economic wellbeing have centered around the property or neighborhoods which are being uprooted. We know what we are doing to these people, but what are we doing for them? ….
>
> The supreme irony of this is the fact that these were problems caused by Federal programs where Federal taxpayer money was involved. ….
>
> The uprooting of an individual, his family, his business or farm, and the taking of his land is a very personal matter. We cannot make the process painless, but we can

45

insure fair and even-handed administration, consistent with protection of individual rights and community needs, no matter what agency is involved.[26]

150.    Section 4601 of the URA provides,

(1) The term "Federal agency" means any department, agency, or instrumentality in the executive branch of the Government, any wholly owned Government corporation, the Architect of the Capitol, the Federal Reserve banks, and branches thereof, and any person who has the authority to acquire property by eminent domain under Federal law. ....

(5) The term "person" means any individual, partnership, corporation, or association.

(6)(A) The term "displaced person" means, except as provided in subparagraph (B) —

(i) any person who moves from real property, or moves his personal property from real property —

(I)    as a direct result of a written notice of intent to acquire or the acquisition of such real property in whole or in part for a program or project undertaken by a Federal agency or with Federal financial assistance; or

(II)    on which such person is a residential tenant or conducts a small business, a farm operation, or a business defined in paragraph (7)(D), as a direct result of rehabilitation, demolition, or such other displacing activity as the lead agency may prescribe, under a program or project undertaken by a Federal agency or with Federal financial assistance in any case in which the head of the displacing agency determines that such displacement is permanent.

151.    The Surface Transportation Board is a "Federal agency" subject to the URA.  The owners bringing this action are "displaced persons" subject to the URA.  The Board's 2019 order invoking section 8(d) of the Trails Act is an order that took these owners' state law property interest and displaced these owners from their property used for their homes and businesses.

152.    Section 4651 of the URA provides,

In order to encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion in the courts, to assure consistent treatment for owners in the many Federal programs, and to promote public confidence in Federal land acquisition practices, heads of Federal agencies shall, to the greatest extent practicable, be guided by the following policies:

---

[26] S. Rep. 91-488, 91st Cong., 1st Sess. 1969, pp. 6-8.

46

(1)  The head of a Federal agency shall make every reasonable effort to acquire expeditiously real property by negotiation.

(2)  Real property shall be appraised before the initiation of negotiations, and the owner or his designated representative shall be given an opportunity to accompany the appraiser during his inspection of the property, except that the head of the lead agency may prescribe a procedure to waive the appraisal in cases involving the acquisition by sale or donation of property with a low fair market value.

(3)  Before the initiation of negotiations for real property, the head of the Federal agency concerned shall establish an amount which he believes to be just compensation therefor and shall make a prompt offer to acquire the property for the full amount so established. In no event shall such amount be less than the agency's approved appraisal of the fair market value of such property. Any decrease or increase in the fair market value of real property prior to the date of valuation caused by the public improvement for which such property is acquired, or by the likelihood that the property would be acquired for such improvement, other than that due to physical deterioration within the reasonable control of the owner, will be disregarded in determining the compensation for the property. The head of the Federal agency concerned shall provide the owner of real property to be acquired with a written statement of, and summary of the basis for, the amount he established as just compensation. Where appropriate the just compensation for the real property acquired and for damages to remaining real property shall be separately stated.

(4)  No owner shall be required to surrender possession of real property before the head of the Federal agency concerned pays the agreed purchase price, or deposits with the court in accordance with section 3114(a) to (d) of title 40, for the benefit of the owner, an amount not less than the agency's approved appraisal of the fair market value of such property, or the amount of the award of compensation in the condemnation proceeding for such property.

(5)  The construction or development of a public improvement shall be so scheduled that, to the greatest extent practicable, no person lawfully occupying real property shall be required to move from a dwelling (assuming a replacement dwelling as required by subchapter II will be available), or to move his business or farm operation, without at least ninety days' written notice from the head of the Federal agency concerned, of the date by which such move is required.

(6) If the head of a Federal agency permits an owner or tenant to occupy the real property acquired on a rental basis for a short term or for a period subject to termination by the Government on short notice, the amount of rent required shall not exceed the fair rental value of the property to a short-term occupier.

(7) In no event shall the head of a Federal agency either advance the time of condemnation or defer negotiations or condemnation and the deposit of funds in court for the use of the owner, or take any other action coercive in nature, in order to compel an agreement on the price to be paid for the property.

(8) If any interest in real property is to be acquired by exercise of the power of eminent domain, the head of the Federal agency concerned shall institute formal condemnation proceedings.  No Federal agency head shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property.

(9) If the acquisition of only a portion of a property would leave the owner with an uneconomic remnant, the head of the Federal agency concerned shall offer to acquire that remnant.  For the purposes of this chapter, an uneconomic remnant is a parcel of real property in which the owner is left with an interest after the partial acquisition of the owner's property and which the head of the Federal agency concerned has determined has little or no value or utility to the owner.

153.    The Trails Act is a federal program intended to acquire property for public recreational trails and encumber land with easements for future railway lines.  See *Preseault I*, 494 U.S. at 17-18 ("First, Congress intended to 'encourage the development of additional trails' and to 'assist recreation[al] users by providing opportunities for trail use on an interim basis.'  Second, Congress intended 'to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use.'") (internal citations omitted).

154.    The Surface Transportation Board did not comply with these provisions of the URA when it acquired these owners' property for the extension of the Legacy Trail and a future railway line.  Specifically, among other violations of the URA, the Board did not:  (a) attempt to acquire these owners' property by negotiation; (b) appraise these owners' property before the Board issued its order imposing the rail-trail corridor easement upon these owners' land; or (c) allow the owners to retain possession of their property until the owners had been paid.  The Board's failure to comply with the URA meant that contrary to the URA these owners were forced to initiate this litigation to obtain compensation for that property the federal government took from them.

155.    Section 4622(a) of the URA provides the federal government must also pay other expenses and costs an owner incurs including:  "(1) actual reasonable expenses in moving himself,

48

his family, business, farm operation, or other personal property; (2) actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation … [and] (3) actual reasonable expenses in searching or a replacement business or farm."

156. Section 4622(d) of the URA provides the federal government must also pay the costs of relocating "utility facilities" including: "(i) any electric, gas, water, steam power, or materials transmission or distribution system; (ii) any transportation system; (iii) any communication system (including cable television); and (iv) any fixtures, equipment, or other property associated with the operation, maintenance, or repair of any such system."

157. These owners have incurred those costs and expenses which the URA requires the federal government to pay and reimburse these owners.

## THE FEDERAL GOVERNMENT'S INVOCATION OF SECTION 8(D) OFTHE TRAILS ACT TOOK THESE PLAINTIFFS' PROPERTY

158. Part of the property owned in fee by Plaintiffs was formerly subject to an easement for railway purposes.

159. The easement did not provide the Railroad, or any other person or entity, the right to use Plaintiffs' property for a public-access recreational trail.

160. When the railroad abandoned operation of a railroad over the property upon which the right-of-way easement has been granted, the property "reverts" to the fee owner and the fee owners' property is unencumbered by any easement for current or future railroad use. *Id.*

161. The Trails Act allows the conversion of abandoned railroad rights-of-way for use as interim public-access recreational trails and preserves the right-of-way for possible future reactivation as a railroad.

162.    The Trails Act further provides that such conversion to trail use "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."  16 U.S.C. § 1247(d).

163.    Prior to the Board's order invoking section 8(d), Plaintiffs' property had never – at any time – been subject to an easement allowing the public to use Plaintiffs' property for a recreational trail.

164.    Plaintiffs' property has never been subject to a general right of the public to cross or make use of his property for any purpose.

165.    Any easement for operation of a railroad across Plaintiffs' property has been abandoned and under Florida law Plaintiffs enjoy the right to use and occupy their property free of any present or future easement for operation of a railroad across their land.

166.    The federal government, through operation of the Trails Act and issuance of the order invoking section 8(d), has: (a) forestalled or taken from Plaintiffs' their state law "reversionary" right to their property; (b) appropriated an easement across Plaintiffs' property for an interim public-access recreational trail, and (c) appropriated an easement for a potential future railroad right-of-way across Plaintiffs' property and has taken from Plaintiffs the rights they enjoy under Florida law to the exclusive use and physical occupation of their land.

167.    Pursuant to the decision of the Federal Circuit in *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004), and *Barclay v. United States*, 443 F.3d 1368 (Fed. Cir. 2006), this taking of Plaintiffs' property occurred when the Board issued the order invoking section 8(d) on May 24, 2013.

168.    According to the Federal Circuit, the date upon which the value of the property taken from Plaintiffs is to be established is the date of the order invoking section 8(d), May 24, 2013.

169.    The United States has neither instituted any condemnation proceeding against Plaintiffs, nor paid, nor offered to pay, Plaintiffs for the property taken from them.

## CLAIM FOR "JUST COMPENSATION" FOR THE PERMANENT PHYSICAL TAKING OF PLAINTIFFS' PROPERTY SUBJECT TO THE ORDER INVOKING SECTION 8(D)

170.    The United States of America is a republic and the actions and laws of the federal government are subject to the Constitution of the United States.

171.    The Fifth Amendment to the Constitution of the United States, "No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

172.    The Fifth Amendment prohibits the United States from taking private property from a citizen without paying that citizen "just compensation."

173.    The Fifth Amendment requirement of paying "just compensation" to a property owner from whom the government takes property includes the obligation of the government to pay the property owner: (a) the fair market value for the property taken as of the date it was appropriated by the federal government — this fair market value includes not only the value of the land actually physically confiscated but also any "severance damages" or loss in value to the property owner's entire parcel caused by the government's taking, (b) payment of an additional amount of delay damages necessary to compensate the property owner for the government's delay in paying the property owner "just compensation."

174.    According to the Federal Circuit, the "date of taking" upon which the government's obligation to pay delay damages begins to run is the date of the order invoking section 8(d), which in this case is May 14, 2019.

51

175.    The Tucker Act, 28 U.S.C. § 1491(a)(1), provides in relevant part, "The United States Court of Federal Claims shall have jurisdiction to render judgment on any claim against the United States founded upon the Constitution."

176.    The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654(c) provides that just compensation includes, "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding."

177.    The United States took Plaintiffs' property by reason of the direct physical taking of Plaintiffs' property and by reason of the damage to Plaintiffs' remaining adjacent property which has suffered a loss of privacy and other severance damages as a result of the proximity of the public on the adjoining trail.  The remaining property is also less valuable by reason of being perpetually encumbered by an easement for trail use and possible future railroad use.

**THIS IS A CLASS ACTION BY THE NAMED PLAINTIFFS ON THEIR OWN BEHALF AND AS REPRESENTATIVES FOR SIMILARLY SITUATED SARASOTA COUNTY, FLORIDA, LANDOWNERS**

178.    Plaintiffs request that this action be certified as a representative class action pursuant to RCFC 23 and that they be names class representatives on behalf of similarly situated Sarasota County, Florida landowners.

179.    This action satisfies the procedural requirement of RCFC 23 because:  (a) the class is so numerous that joinder of all members is impracticable; (b) there are questions of law or fact common to the class; (c) the claims of the named Plaintiffs are typical of the claims of the class; and (d) the named Plaintiffs and their counsel will fairly and adequately protect the interests of the class.

**RELIEF REQUESTED**

These owners of the fifteen properties subject of this lawsuit ask this Court should enter an order granting these Florida landowners the following relief:

A.  Grant these Plaintiffs' motion to certify this action as an opt-in class action provided in this Court's Rule 23.

B.  Declare the federal government took each of these owners' private property in violation of the Fifth Amendment when the Board issued its May 19, 2019, order invoking section 8(d) of the Trails Act.

C.  Enter judgment against the United States directing the United States Treasury to pay each of these owners the full fair-market value of that property the federal government took from each of these Florida landowners.

D.  Order the United States to pay these owners compensation for the delay between when the government took the owners' property on May 14, 2019, and when the government honors its constitutional obligation and finally pays these owners compensation for the land it took.

E.  Reimburse these owners' litigation costs and attorney fees as provided in the URA, 42 U.S.C. §4654(c), which includes, "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding."

F.  Award such further relief as this Court may deem just and proper.

Date: May 9, 2025                              Respectfully submitted,

*/s/ Mark F. (Thor) Hearne, II*
MARK F. (THOR) HEARNE, II
Timothy Belz
J. Matthew Belz
True North Law, LLC
112 South Hanley Road, Suite 200
St. Louis, MO  63105
Phone: (314) 296-4000
Fax: (314) 296-4001
thor@truenorthlawgroup.com

*Counsel for the Landowners*